# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

LISA M. NOYES,      )
            )
  **Plaintiff,**     )
            )
  **v.**         )   **CAUSE NO. 1:07-CV-00228**
            )
MICHAEL J. ASTRUE,    )
**Commissioner of Social Security,** )
            )
  **Defendant.**    )

## OPINION AND ORDER

Plaintiff Lisa M. Noyes appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability, Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the

Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Noyes applied for DIB and SSI on March 19, 2003, alleging that she became disabled as

of January 1, 1988. (Tr. 59-61, 76, 240-41.) However, Noyes did not become insured for DIB

and SSI until April 1, 1999, and therefore that date was considered as the alleged onset date of

her benefits; her date last insured for purposes of her DIB claim was September 30, 2003.[2] (Tr.

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] In order to be successful with respect to her DIB claim, Noyes must establish that she is disabled as of September 30, 2003, though this date is not relevant to her SSI claim. *See, e.g., Andresen v. Chater*, No. 96 C 3961, 1997 WL 223061, at *5 (N.D. Ill. Apr. 28, 1997) ("[I]n order to recover DIB it is generally the claimant's burden to establish that he or she became disabled *on or before the date last insured.* In order to recover SSI it is not necessary for the claimant to make such a showing [with respect to her date last insured]." (emphasis added and citation

67.)  The Commissioner denied her application initially and upon reconsideration, and Noyes requested an administrative hearing. (Tr. 21-23, 50-58.)

Administrative Law Judge ("ALJ") John S. Pope conducted a hearing on January 13, 2005, and rendered an unfavorable decision to Noyes approximately one month later, that is, on February 24, 2005. (Tr. 12-20.)  After the Appeals Council denied Noyes's request for review, she sought judicial relief in this Court. *Noyes v. Comm'r of Social Security*, No. 1:05-cv-278 (N.D. Ind. March 21, 2006).  On March 20, 2006, this Court issued an Opinion and Order remanding the case to the Commissioner for further proceedings.[3] *Id.*

Noyes filed subsequent claims for DIB and SSI which, after denial upon initial consideration and reconsideration, were ultimately consolidated with her March 2003 claims. (Tr. 336, 357-63.)  On August 9, 2006, ALJ Pope held a *de novo* hearing, at which Noyes (who was represented by counsel), Leslie Sheeley (Noyes's sister), Timothy Brown (Noyes's friend), and a vocational expert ("VE") testified. (Tr. 648-98.)  On March 19, 2007, the ALJ again rendered an unfavorable decision to Noyes, concluding that she was not disabled because she could perform her past relevant work as a stocker despite the limitations caused by her impairments. (Tr. 336-51.)  The Appeals Council denied Noyes's request for review, making the ALJ's second decision the final decision of the Commissioner. (Tr. 322-30.)  On September 7, 2007, Noyes filed a complaint with this Court, seeking relief from the Commissioner's final decision, and the matter is now fully briefed. (Docket # 1, 19, 24, 28.)

---

omitted)).

[3] Specifically, the Court found that the ALJ failed to properly evaluate several medical opinions of record, improperly discredited Noyes's testimony, and failed to consider the testimony of Timothy Brown, one of Noyes's witnesses.

## II.  NOYES'S ARGUMENTS

Noyes alleges four flaws with the Commissioner's final decision.  Specifically, Noyes claims that the ALJ improperly evaluated the credibility of her symptom testimony; improperly rejected Brown's testimony; and improperly evaluated the opinions of Dr. Sami, a psychiatrist who treated her in the past, and Dr. Rustagi, her current treating psychiatrist. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 17-25.)

## III.  FACTUAL BACKGROUND[4]

### A.  Background

At the time of the ALJ's decision, Noyes was thirty-one years old and had an eleventh grade education. (Tr. 59, 254, 256.)  Since 1993, Noyes has worked for an extensive list of employers for short periods of time, including employment as a fast food worker, certified nursing assistant, a machine operator, a janitor, and a retail worker. (Tr. 62-66, 259-65, 318.) Noyes contends that she became disabled primarily due to bipolar disorder; depressive disorder, not otherwise specified ("NOS"); panic disorder with agoraphobia; and borderline personality disorder.[5] (Opening Br. 3.)

At the administrative hearings, Noyes testified that she cannot work because she "do[esn't] like being out, period" and, more particularly, because she felt judged and "picked on" by her bosses, co-workers, and the public, although she admitted that most of the criticism she received from her bosses was fair since she was not completing her tasks and was rude to

---

[4]  The administrative record in this case is voluminous (698 pages); therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[5]  Because Noyes apparently does not dispute the ALJ's findings regarding her physical conditions, specifically her arthritis, the Court will focus its inquiry on those findings pertaining to her mental health.

3

customers. (Tr. 268, 289-93.)  She stated that her main problem with working was absenteeism because she "didn't want to get out of bed." (Tr. 289, 293.)

She further complained of daily depression and anxiety that keeps her in bed and makes her "completely paralyzed," stating that she "just [does] not want[] to deal with [her] family or basically anybody." (Tr. 273, 279, 654.)  She reported that her symptoms include irritability and anger, headaches, lack of energy, difficulty concentrating and remembering, chest pain, sleep problems, muscle aches, and diarrhea, stating at her second hearing that her symptoms had worsened since her first hearing. (Tr. 273, 279, 654, 658-64, 667.)

She testified that she is supposed to see her doctor about once a month, but that she does not always keep her appointments if they are early or if she is scared that something bad will happen. (Tr. 280-81, 295-96, 654-55.)  Noyes also confided that after the counselor she was seeing at Park Center in 2003 was transferred, she stopped attended therapy sessions, despite a new counselor contacting her to set up an appointment; she further commented, however, that her lack of finances also affected her decision to stop therapy at Park Center. (Tr. 281-82, 655-57.)  At the second hearing, Noyes reported that she began to receive Medicaid benefits in early 2006 and therefore resumed treatment with a new psychiatrist and counselor. (Tr. 656.)

Noyes further testified that she is able to perform most household chores and care for her children on weekends when she has visitation, but that she "used to do a lot more with them," explaining that her children "play a lot by themselves." (Tr. 273-78, 665.)  She further stated that she does not go grocery shopping and cannot manage her financial affairs. (Tr. 273-78.)  She reported that she does not have any friends, never spends times with friends, and does not like to be around people, and that she has not used drugs for years. (Tr. 282-83, 298, 667, 676-78, 680-

4

81.)  She confided, however, that she has used alcohol more recently, though not in the 30 days preceding her second hearing. (Tr. 667, 676-78.)  She described her typical day as rising at about 4:00 in the afternoon, caring for her four cats, watching television, and talking with her mom or sister on the telephone; she relies on Brown to pick up items for her, if necessary. (Tr. 668-70.)

Lisa Sheeley, Noyes's sister, who sees her about once a month, also testified, indicating that she thought Noyes "sugarcoated" her conditions and that her problems are "extremely worse th[a]n what she described." (Tr. 301.)  In fact, at the second hearing, Sheeley stated that Noyes's mental status had worsened since the first hearing, stating that Noyes was sleeping more and was more irrational. (Tr. 682, 685.)  More specifically, Sheeley reported that Noyes thinks the government and her television are "out to get her" and complains about things that don't make any sense." (Tr. 682, 685.)  She stated that Noyes does not get out of bed or answer her phone and that it was impossible to have a relationship with her. (Tr. 301, 685.)  Sheeley also testified that an anxious Noyes calls up to five times a day and also during the night "once every couple weeks," resulting in Sheeley staying on the phone to reassure her for at least four hours. (Tr. 304-05, 682-83.)

Timothy Brown, Noyes's former live-in boyfriend and supervisor who stops to check in on Noyes "[a]t least once every other day," also testified at the hearings. (Tr. 305-15, 686-92.)  At the first hearing, he reported that he observed "a lot of forgetfulness" and absenteeism while Noyes was working as a seasonal employee and that he had to help her at the end of her shift because her work was not completed. (Tr. 307, 310.)  He also explained that although he gave Noyes "normal" criticism while on the job, he felt he needed to be "extra nice" to her so she would not overreact. (Tr. 309.)  Despite these problems, Brown stated that had there been an

open position, Noyes could have successfully continued to work there if she showed up on a regular basis. (Tr. 310.)  Brown further testified that after Noyes's employment ended, they began dating and eventually moved in together, and he continued to observe her forgetfulness and emotional outbursts. (Tr. 312.)  Stating that they did not go out much, Brown explained that if there was "a bunch of people, you might as well forget it." (Tr. 314.)

At the second hearing, Brown reported that Noyes's mental status had worsened since the first hearing, stating that her "mood swings are more often and more severe" and that she is more easily angered. (Tr. 687, 689-90.)  Brown stated that he takes her children on outings and picks up items from the grocery store for her so that she does not have to go out. (Tr. 689-90.)  He confided that he has not lived with Noyes in two years, stating that he "need[s] [his] sanity" and that he "can only deal with it so much." (Tr. 690.)

### B. Summary of the Relevant Medical Evidence

### 1. Medical Evidence of Record Before the ALJ's First Decision

Although Noyes alleges disability since 1988, her medical records date from March 27, 2003, eight days after she filed for DIB and SSI, when Heidi Hockemeyer, a social worker at Neuropsychiatric Associates, performed an intake assessment.[6] (Tr. 149-53.)  Noyes complained of disrupted sleep, loss of appetite, and a racing heart when she was angry or anxious. (Tr. 149.) She also described impulses to hurt herself, which resulted in cutting her arm and attempting suicide. (Tr. 150.)  Reporting that she consumed alcohol two days before the exam and smoked marijuana three days prior, Noyes also admitted to using acid, cocaine, uppers, mushrooms, and

---

[6] The transcript provides little insight into what medical conditions or treatment Noyes had before 2003. During this appointment, however, Noyes reported that when she was twelve, she saw a child psychologist, who prescribed anti-depressants that she took for one year. (Tr. 149.)  She also claimed to have had "talk therapy" with a pastor for one year. (Tr. 149.)

heroine in the past. (Tr. 152.)

Hockemeyer diagnosed mood disorder, alcohol abuse, and marijuana abuse and made rule out diagnoses of alcohol dependence, bipolar disorder, and personality disorder, rating Noyes's Global Assessment of Functioning ("GAF") at 55 (moderate symptoms).[7] (Tr. 153.) Hockemeyer recommended continued assessment, evaluation for medication, and one-on-one psychotherapy, but Noyes was eventually discharged because she did not keep any of her follow-up appointments. (Tr. 146-48, 153.)

On June 13, 2003, Candace L. Martin, Psy.D., performed a psychological evaluation at the request of the Social Security Administration. (Tr. 155-61.) Noyes informed Dr. Martin that she filed for disability because "[she] can't cope with anything," but also explained that she quits jobs because she gets bored and is not a "morning person." (Tr. 155.) Noyes reported feeling like people are judging her, thinking that people are weird and scary, preferring to be left alone, and not liking what people say to her. (Tr. 155.) Although Noyes told Dr. Martin that from ages fifteen to seventeen she used marijuana and alcohol "to be with her peers," she stated that she does not use these substances anymore. (Tr. 155.)

Regarding prior mental health evaluations, Noyes reported having a psychological examination at Park Center in 1998 at the request of Child Protective Services ("CPS")[8] and that

---

[7] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

[8] Noyes has two sons, who were ages seven and nine at the time of this exam. (Tr. 155.)

she went to counseling four times during February and March of 2003 at the office of "her psychiatrist," Dr. Bisht.[9] (Tr. 155.) Noyes reported taking special education classes in school, though Dr. Martin noted that her current intellectual functioning measured by an IQ test was in the average range. (Tr. 155, 158.) In addition, Dr. Martin documented that Noyes's "long-term, intermediate, and short-term memory skills all appear to be quite within normal limits," as evidenced by the results of her IQ test and mental status exam. (Tr. 155, 158.)

Dr. Martin also concluded that "[i]n general, [Noyes's] mental status functioning appeared to be quite normal," although the mental status exam suggested that Noyes "tends to be inattentive toward her environment and daily events in the world" and that she shows "some mild difficulty with judgment and insight suggesting possible tendencies towards poor impulsivity control." (Tr. 158.) Dr. Martin opined that Noyes's ability to function independently was "limited only in respect to her preferred irresponsibility for financial management." (Tr. 158.) Dr. Martin assigned Noyes a GAF of 57 (moderate symptoms) and diagnosed her with an adjustment disorder with mixed anxiety and depressed mood, and possible dysthymic disorder. (Tr. 159.) Dr. Martin concluded that Noyes was capable of gainful employment because she was able to "communicate effectively, interact one-on-one quite appropriately, and focus her attention and sustain concentration on various tasks." (Tr. 158.)

At the request of the State Agency, W. Shipley, Ph.D., and F. Kladder, Ph.D., reviewed the record. (Tr. 162.) Both diagnosed Noyes with affective disorder but concluded it was not a severe impairment. (Tr. 162, 174.) When asked about her functional limitations, they opined that

---

[9] Dr. Bisht is a doctor at Neuropsychiatric Associates, who coincidentally signed Noyes's letter of discharge. (Tr. 146.) The transcript does not indicate that Noyes ever had an appointment with Dr. Bisht, and apparently Noyes now concedes that the March 27 appointment was the only time she sought treatment at Neuropsychiatric Associates.

Noyes had "mild" restriction of activities of daily living; "mild" difficulty in maintaining social functioning; "mild" difficulty in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (Tr. 172.) Larry Kravitz, Psy.D., also reviewed the record for the State Agency, concurring with the opinions of the other State Agency medical consultants.[10] (Tr. 176-78.)

On October 3, 2003, Noyes sought treatment at Park Center, where she was assessed by Heidi Hedrick, Ph.D. (Tr. 224.) Among her complaints, Noyes reported that she is angry all the time, does not trust anyone, compulsively cleans, has problems sleeping, has problems with her body image, and her mind never stops. (Tr. 224.) She also described feeling lonely, anxious, nervous, worried, and that everything is a big deal. (Tr. 224.) Indicating that her boyfriend of three and a half years recently moved out of her house, Noyes believed this might be the cause of her stress. (Tr. 225.) Noyes reported no difficulty in taking care of her personal care needs and that her mother is her support system. (Tr. 225.) On mental status exam, Dr. Hedrick found Noyes's appearance and behavior appropriate; her mood/affect, speech, and thinking form normal; her insight minimal; and her thought content blaming. (Tr. 225-26.) She diagnosed depressive disorder, NOS and borderline personality disorder, rating Noyes's GAF at 65 (mild symptoms). (Tr. 226.) Dr. Hedrick recommend individual therapy and a psychiatric evaluation. (Tr. 217, 227.)

On November 24, 2003, Jennifer Fray, Psy.D., of Park Center performed a psychological evaluation at the request of the Allen County Office of Family and Children to determine

---

[10] It is important to note at this point in the chronology of the medical evidence that on September 30, 2003, Noyes's DIB insured status expired.

Noyes's eligibility to receive DIB. (Tr. 218.)  Noyes's complaints were similar to those she

reported to Dr. Hedrick, primarily complaining of depression, which she claimed she suffered

from since age twelve but had gotten worse over the past year. (Tr. 218-19.)  Reporting

decreased energy and motivation, Noyes stated that she does not do much and does not have any

specific interests. (Tr. 218.)  Claiming that she has suffered from anxiety since the age of thirteen

or fourteen, Noyes reported that she does not leave her home and that her anxiety centers around

fears of men looking at her and what people think about her. (Tr. 219.)  She also reported

problems with anger and irritability, which also results in her avoiding people and not leaving

her house. (Tr. 219.)  Noyes reported that she drank one pint of vodka on October 30, stating that

sometimes she can control her intake of alcohol and sometimes not. (Tr. 220.)  She admitted to

some use of marijuana, most recently one week prior to the evaluation, but did not believe she

had any problems with drugs and alcohol. (Tr. 220.)

On mental status examination, Dr. Fray found that Noyes's motor activity was a little

overactive, as she moved around "quite a bit" in her seat during the early part of the assessment

but slowed down and relaxed after a few minutes. (Tr. 220-21.)  Dr. Fray also noted that Noyes

appeared to have difficulty concentrating on the task at hand due to negative feelings about

herself, stating "I feel very stupid" throughout the assessment. (Tr. 221.)  Dr. Fray concluded

that Noyes's reasoning was within the average to low-average range and that her judgment was

likely influenced by indecisiveness and possibly impulsiveness. (Tr. 222.)  Diagnosing

dysthymic disorder, social phobia, and rule out borderline personality disorder, Dr. Fray rated

Noyes's GAF at 50 (serious symptoms).  Dr. Fray recommended that she continue individual

therapy, possibly try group therapy, undergo a psychiatric evaluation to evaluate the usefulness

of medications, and undergo further psychological testing to determine whether she has a personality disorder. (Tr. 223.) Dr. Fray's prognosis was guarded due to Noyes's inconsistency in attending appointments. (Tr. 223.)

On January 7, 2004, Christine Raches, a psychology intern at Park Center, developed a treatment plan with Noyes, which included weekly sessions with Raches, but Noyes refused a medication appointment; Dr. Fray signed the plan to certify its medical necessity. (Tr. 214-16.) During this appointment, Raches noted diagnoses of major depressive disorder, recurrent; mild and generalized anxiety disorder; and opined a GAF of 51 (moderate symptoms). (Tr. 214.) On March 3, 2004, Raches conducted a ninety day review of this treatment plan and developed a continuing care plan, noting that Noyes was beginning to use self-talk as well as re-framing to decrease her depression and that she had become more honest and open in her sessions. (Tr. 211.) Raches opined, however, that Noyes needed to be more active and follow through with items discussed in therapy, to increase her activity level, and to attend a medical evaluation. (Tr. 211.) Dr. Fray signed this report, noting that Noyes's symptoms and severity might justify more intensive services. (Tr. 213.)

On March 29, 2004, Dr. Mohammad Sami of the Park Center completed a psychiatric evaluation of Noyes, diagnosing depression, panic disorder with agoraphobia, and social anxiety, rating Noyes's GAF at 55 (moderate symptoms). (Tr. 210, 229.)

In May 2004, Noyes's treatment plan was reviewed by Raches, who noted that Noyes was more honest in therapy, was completing her homework, was developing openness to opinions, was beginning to explore her rigid thinking, and was referred to Dialectical Behavioral

Treatment ("DBT") for more intensive services.[11] (Tr. 207.)  Dr. Fray signed this review, noting that the transfer to DBT appeared appropriate given Noyes's clinical needs and Raches's internship ending soon. (Tr. 209.)

In July 2004, her plan was reviewed again, with Raches noting that Noyes was more open during therapy, was more willing to explore rigid thinking, was using relaxation skills as well as mindfulness skills to target irrational thoughts, and was taking medications more regularly. (Tr. 203.)  Although she was initially resistant, Noyes made an appointment for DBT. (Tr. 203.)  Dr. Fray signed the review, noting Noyes's progress. (Tr. 205.)

Raches completed a Hoosier Assurance Plan Instrument ("HAPI") on July 29, 2004, rating Noyes's anxiety/worrying and her depression as severe. (Tr. 195.)  Raches found, however, that Noyes had only minimal difficulties or problems in the following functional categories: occupational functioning, daily functioning and independent living skills, time and task orientation and learning ability, family support and interpersonal relations, and risk behavior. (Tr. 196-97, 200.)  Raches opined that Noyes requires total reliance on mental health services, does not take responsibility, and requires supervision, noting that without therapy and medications, Noyes would experience "severe difficulty in occupational and interpersonal functioning such that poverty, possible suicide, and harm to others is possible and appeared imminent." (Tr. 201.)

Noyes did not show up for her August 2, 2004, appointment with Dr. Sami, but she did make her September 30, 2004, appointment. (Tr. 229.)  Dr. Sami noted that Noyes presented

---

[11] DBT is a "cognitive-behavioral therapy for people with borderline personality disorder or other impulse control problems such as suicidal and self-injurious behavior and risky substance use." Park Center, Inc., *Child & Adult Services* (March 7, 2006), http://www.parkcenter.org/Child%20and%20Adult%20Services.htm.

with a history of depression and described paranoia, anxiety, mind racing, nervousness, mood swings, agitation, anger, frustration, panic attacks, and paranoid thoughts around people. (Tr. 229.) She reported that at times, she thinks about dying and also believes she is feeling crazy, that she is not feeling better, and that she is unable to function. (Tr. 229.) Noyes further stated that she had stopped her Paxil because it was causing problems and that her Trazodone was not helping; therefore, Dr. Sami adjusted her medications. (Tr. 229.)

Noyes went to the emergency room on October 12, 2004, complaining of symptoms that were "kind of like an anxiety attack." (Tr. 184.) She reported a history of anxiety attacks caused by anger or being worked up over something, but said this attack occurred when she was just resting and under no stress. (Tr. 184.) After physical examination and testing were normal, the emergency room physician discharged Noyes, concluding that her symptoms were related to her anxiety and the new antidepressant medication she was taking, recommending that she follow up with her primary care physician. (Tr. 184-85.)

On October 27, 2004, Dr. Sami performed another psychiatric evaluation and completed a mental impairment questionnaire and medical source statement, but the record indicates that Noyes did not show up for any of her scheduled appointments after this date. (Tr. 210.) On the mental impairment questionnaire and medical source statement, Dr. Sami diagnosed depressive disorder, NOS; panic disorder with agoraphobia; and borderline personality traits, rating her current GAF at 48 (serious symptoms) and her highest GAF during the past year at 60 (moderate symptoms). (Tr. 179.) He listed clinical findings and results of mental status examinations as severe anxiety, panic attacks with shortness of breath, fear of dying, isolation, depression, paranoid thoughts, and people talking about her. (Tr. 180.) Opining that Noyes would miss

about four days of work per month due to her impairments or treatment, Dr. Sami rated her ability to perform seventeen work-related mental activities as "poor" and rated the remaining five activities as "fair." (Tr. 181-83.) He opined that her severe anxiety, frequent panic attacks, fear of anxiety attacks, poor concentration, and forgetfulness supported this assessment. (Tr. 183.)

    2. <u>Additional Medical Evidence of Record Before the ALJ's Second Decision</u>

On December 9, 2004, Noyes walked into Park Center and reported that she had a panic attack in a grocery store the previous night and passed out. (Tr. 602.) When she was told that she needed to be worked in because she had missed her last two appointments, she became angry, stating that the panic attacks and depression keep her from coming in and that Park Center should consider her illness and her lack of transportation. (Tr. 602.) She was told to wait and see if she could be worked in, but she stated that she could not wait. (Tr. 602.) Dr. Sami was contacted, and he prescribed Klonopin for anxiety. (Tr. 602.) She was contacted by Park Center about the prescription and told that if she could not keep her appointments she should seek treatment elsewhere. (Tr. 602.)

On February 24, 2005, Noyes saw Dr. Sami, reporting that she was still having panic attacks and was isolating herself all of the time. (Tr. 602.) She also reported having chest pain, heart racing, and difficulty breathing, stating that is why she did not want to go outside. (Tr. 602.) She further reported having suicidal ideation and depression, but no thoughts of killing herself. (Tr. 602.) She confided that she had stopped taking the Zoloft when she ran out of it. (Tr. 602.) She also felt that people were after her. (Tr. 602.) Dr. Sami noted that Noyes had

been off medication for some time and that her depression had kept her from coming in to see him. (Tr. 602.) Noyes reported that she was tired of her medication, and thus he started her on Lexapro and Risperdal, in addition to continuing her Clonazepam. (Tr. 602.) She did not show for her appointment on April 21, 2005. (Tr. 602.) On June 24, 2005, Noyes was discharged from Park Center because of noncompliance with treatment; her GAF at discharge was 48-50 (serious symptoms). (Tr. 594.)

On July 14, 2005, Noyes was seen by Dr. Barbara Gelder, a psychologist, for a psychological consultation at the request of Social Security. (Tr. 548-52.) Noyes reported to Dr. Gelder that she was depressed; that she felt lonely, tired, and worried; that she experienced headaches; and that she was often irritable and angry. (Tr. 548.) She also reported myriad other problems, including difficulty keeping friends, fears that something bad is going to happen, distrustfulness, difficulties with concentration, difficulties with sleep, and racing thoughts. (Tr. 548-49.) Dr. Gelder noted that Noyes was appropriately dressed, that her personal grooming and hygiene were adequate, and that she was cooperative, but observed that she was somewhat impulsive during the evaluation. (Tr. 549.) On mental status exam, Noyes had some difficulty responding to proverbs, had difficulty with recall of objects, exhibited a marginal fund of general information, and presented with a somewhat depressed and anxious mood. (Tr. 549-51.) Dr. Gelder assigned a diagnosis of post traumatic stress disorder, major depression, and generalized anxiety disorder. (Tr. 549-51.) Noyes's current GAF was rated at 43 (serious symptoms), and her past GAF was rated at 47 (serious symptoms). (Tr. 552.)

On August 19, 2005, Dr. Shipley, a State agency psychologist who had reviewed Noyes's record two years earlier, reviewed Noyes's record again and completed a psychiatric review

technique and mental residual functional capacity assessment. (Tr. 553-70.)  After summarizing the report of Dr. Gelder and written reports of Noyes and her mother, Dr. Shipley concluded that Noyes retained the "ability to retain the ability to do simple repetitive tasks." (Tr. 555.)  A second state agency psychologist also reviewed the evidence of record and affirmed Dr. Shipley's opinion. (Tr. 555.)

On March 2, 2006, Noyes was seen by Rosalind Huang, Psy.D., for a psychological evaluation at the request of Social Security. (Tr. 572-75.)  She told Dr. Huang that she felt overwhelmed, scared, and sad; slept only three to four hours a day; had impulsive tendencies; had no energy or motivation; and experiences intense anger. (Tr. 573.)  Dr. Huang found that Noyes's most pronounced psychiatric symptoms included depression and anxiety. (Tr. 575.)  She assigned Noyes a diagnosis of major depressive disorder, severe, and anxiety disorder, NOS, and rated her GAF at 50 (serious symptoms). (Tr. 575.)  Dr. Huang also concluded that Noyes would need assistance in managing her funds due to her impulsivity. (Tr. 575.)

On March 23, 2006, Noyes underwent a psychiatric evaluation by Dr. Prevesh Rustagi and Michele Ferguson. (Tr. 581-85.)  She reported that she had times of higher energy, which she spent in excessive cleaning and reading; however, she stated that she is never really happy with this increase in energy and that it happens only a couple of times a year. (Tr. 581.)  She reported that most of the time she felt depressed and did not want to get out of bed; that she could become very irritable very quickly and angry for no reason; and that she felt like people were watching her and judging her. (Tr. 581.)  She felt that she could "read people's minds" to know that they were thinking bad things about her and reported that she worries and obsesses about everything. (Tr. 581.)  She felt that cell phones were being monitored, and the government

knows everything about everyone's life, including her evaluation. (Tr. 581.)  She confided having difficulty getting along with people and that she never agreed with anyone. (Tr. 582.)  She reported that she had gained 60 pounds in the past year and that she had trouble sleeping. (Tr. 582.)  She also stated that she quit multiple jobs because she felt that she was being judged and could not catch on fast enough. (Tr. 582.)

On mental status exam, Noyes's mood and affect were somewhat anxious and depressed with restricted affect. (Tr. 584.)  Her thinking and perception indicated a suspiciousness and delusions, ideas of reference, or obsessions. (Tr. 584.)  Dr. Rustagi assigned a diagnosis of bipolar disorder and assigned her a current and past year GAF of 50 (serious symptoms), stating that Noyes was "unemployable." (Tr. 584.)

On April 21, 2006, Noyes saw Dr. Rustagi, stating that she was ambivalent about psychotropic medication. (Tr. 642.)  They discussed whether she would rather continue psychotherapy longer and defer medications. (Tr. 642.)  Dr. Rustagi found that Noyes continued to remain disabled by her psychiatric illness. (Tr. 642.)  On April 30, 2006, she was seen by Ms. Constance Anderson at Dr. Rustagi's office for her current symptoms of severe insomnia, fluctuating moods with agitation, depression, ongoing anxiety, panic, and nightmares. (Tr. 643.)  Anderson saw Noyes again on May 16, reporting symptoms of increased agitation, crying spells, traumatic memories, ongoing fears, hypersomnia, ongoing depression, social isolation, avoidance, and racing thoughts. (Tr. 641.)  They discussed dependency issues regarding her breakup with her boyfriend and her low self-esteem. (Tr. 641.)

On May 31, 2006, Noyes saw Dr. Rustagi, stating that she was now ready to take medication in small doses. (Tr. 639.)  He started her on a low dose of Mirtazapine. (Tr. 639.)

She was seen again by Anderson one month later reporting symptoms of instability, easy agitation, weight gain, constant worry, hypervigilance, obsessive worry, compulsive behaviors, and guilt causing sadness. (Tr. 638.)  They discussed compliance issues and how chaotic she felt her life was, especially in light of her dependency issues. (Tr. 638.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[12] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the

---

[12] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On March 19, 2007, the ALJ rendered his opinion. (Tr. 336-51.)  He found at step one of the five-step analysis that Noyes had not engaged in substantial gainful activity since her alleged onset date and at step two that Noyes's arthritis, anxiety, and depression were severe impairments. (Tr. 339.)  At step three, he determined that Noyes's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 339-40.)  Before proceeding to step four, the ALJ determined that Noyes's testimony of debilitating limitations was "not entirely credible" (Tr. 34) and that she had the following RFC:

> [T]he claimant has the residual functional capacity to lift/carry 20 pounds
> frequently and ten pounds occasionally; the claimant is able to stand/walk for six
> hours out of an eight-hour workday; the claimant is able to sit for six hours out of
> an eight-hour workday; and the claimant is able to perform simple and repetitive
> tasks involving only occasional contact with the public, coworkers and
> supervisors without strict time in production requirements.

(Tr. 340.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Noyes could perform her past relevant work as a stocker; in addition, he stated that Noyes could perform approximately 500 sedentary jobs and 10,000 to 20,000 light unskilled jobs in the regional economy, including laundry folder (200 jobs), assembler (1,000 jobs), and inject molding machine tender (300 jobs). (Tr. 350-51.)  Therefore, Noyes's claims for DIB and SSI were denied. (Tr. 351.)

### C. The ALJ's Credibility Determination Will Not Be Disturbed

Noyes asserts that the ALJ erred when he concluded that the credibility of her testimony of debilitating mental limitations was "not entirely credible." (Tr. 347.)  Noyes's argument

ultimately falls short of warranting a remand.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

In reaching the credibility determination, the ALJ reasoned:

> The [ALJ] finds that the claimant's testimony is not fully credible. The claimant admitted to Dr. Martin that she cannot hold a job because she gets bored and that most of the time she quits because she is not a "morning person". The claimant testified that she is always on edge. However, the claimant was noted to be spontaneous and talkative during her psychiatric examination with Ms. Ferguson and Dr. Rustagi on July 25, 2006; less than one month before the hearing held on August 9, 2006. The claimant was noted to be fairly alert; her thinking and perception was intact; her insight and judgment was fair; memory was grossly intact; and concentration was fair. She was also noted to be cooperative, talkative, and pleasant at prior mental status examinations, as well. As recently as March 26, 2006, claimant reported to the consultative examiner that . . . she does the cooking, cleaning and laundry and [ac]companies her boyfriend to grocery shop. These findings do not support the claimant's testimony.
>
> Also, the claimant testified that she was treated at Park Center for mental health and that she was terminated because she did not keep appointments. She said that a lot of times she just couldn't get up because she was so tired and a couple of times she didn't have a ride. The medical evidence supports that the claimant was terminated from Park Center because she missed about six

appointments in a nine month period, but also revealed that the claimant was also noncompliant with medications, which she failed to admit. On February 24, 2005, Dr. Sami reported that the claimant was off medication . . . and she was tired of the medication. The [ALJ] notes that . . . when you do not follow prescribed treatment without a good reason, we will not find you disabled . . . . Therefore, in accordance with SSR 96-7p, the undersigned finds that the claimant's testimony is not wholly credible.

(Tr. 347 (internal citations omitted).) Here, not deterred by the ALJ's lengthy analysis, Noyes takes issue with each and every basis that the ALJ provided for the credibility determination.

To begin, Noyes challenges the ALJ's reliance on her statement to Dr. Martin that she cannot hold a job because she "gets bored" and is not a "morning person," asserting that these statements are merely reflective of her mental illness, particularly her depression. Admittedly, Noyes's argument has some merit, as the record evidences her problems with concentration (Tr. 567, 637), and sleeping (Tr. 155, 179, 218, 224, 584-49, 573, 582, 641, 643). Nevertheless, the ALJ is entitled to consider any inconsistent statements by the claimant. SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency . . . . The adjudicator must consider such factors as . . . [t]he consistency of the individuals' own statements."). And, Noyes's statements to Dr. Martin concerning the reasons for her unemployment, that is, that she simply gets bored and dislikes getting up in the morning, do indeed appear inconsistent with her claim that she cannot work due to a disabling mental impairment.

Noyes next takes issue with the ALJ's view that her statement that she "is always on edge" is inconsistent with recent medical evidence reflecting that she was cooperative, pleasant, and talkative during recent medical examinations. While this assertion by the ALJ is not perhaps the most compelling, it cannot be said that the ALJ is not "patently wrong" in making this

observation. *See generally Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("So the administrative law judge's opinion is vulnerable. But that is nothing new. No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." (citations omitted)).

Next, Noyes attacks the ALJ for considering her daily living activities in the credibility equation, asserting that her daily routine includes only "minimal" activities. On that front, it is proper for an ALJ to consider a claimant's daily activities as a factor when assessing the credibility of a claimant's complaints. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p; *see Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility). Here, the ALJ properly considered that Noyes's daily activities included performing some household activities; yet, he did not improperly equate this evidence with an ability to work full-time. *Compare Schmidt*, 395 F.3d at 746-47, *and Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004), *with Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006), *and Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005).

Finally, Noyes challenges the ALJ's consideration in the credibility analysis of her failure to comply with prescribed treatment.[13] At the hearing, the ALJ asked Noyes why she failed to consistently comply with treatment, and she provided several reasons, including that she

---

[13] Noyes also argues that "the ALJ conceded that she was disabled" because he applied the [failure to follow prescribed treatment] regulation," which under Social Security Ruling 82-59 is applied "only where the evidence establishes that the claimant is disabled." (Opening Br. 17.) Noyes's argument is misplaced, as the ALJ considered this regulation solely in the context of the credibility analysis, never suggesting that Noyes's noncompliance with treatment in and of itself was a basis for denying her disability. *See generally Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("And while the ALJ must have built a logical bridge from the evidence to his conclusion, we will nonetheless give the opinion a commonsensical reading rather than nitpicking at it." (citations and internal quotation marks omitted)).

"was so tired" that she could not get out of bed in the morning and that at times she "didn't have a ride." (Tr. 347.)  The ALJ is entitled to consider Noyes's failure to consistently comply with prescribed treatment, taking her explanations into consideration, when making the credibility determination. *See* 20 C.F.R. §§ 404.1529, 416.929; *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005); *Smith v. Apfel*, 231 F.3d 433, 440 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (considering claimant's failure to seek medical treatment and use of only sporadic pain medication when discounting claimant's complaints of severe pain); SSR 96-7p.  Here, the ALJ's opinion (Tr. 347), as well as the hearing transcript (Tr. 655-57, 673, 675-76), show that the ALJ was indeed aware of Noyes's proffered explanations for her noncompliance when making the credibility determination.

Admittedly, the Seventh Circuit Court of Appeals has recognized that "mental illness in general and bipolar disorder in particular . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (internal citations omitted).  Though Noyes would like to attribute her noncompliance to the episodic nature of her mental illness, she fails to point to any medical opinion in the record that excuses her noncompliance based on this premise.  Rather, the record suggests just the opposite – that her noncompliance was attributable, at least in part, to other factors, such as transportation difficulties and her dislike of mornings. (*See, e.g.*, Tr. 155 (reflecting Noyes's statement to Dr. Martin that "[s]he finds third shift to be the best").)

In sum, the Court will not accept Noyes's plea to reweigh the evidence in the hope that it will come out in her favor this time. *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004).  The ALJ has built an accurate and logical bridge between the evidence and his

conclusion, *Ribaudo*, 458 F.3d at 584, and his conclusion is not "patently wrong," *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *id.*, will not be disturbed.

### D. The ALJ Properly Considered Brown's Testimony

Noyes next asserts that the ALJ improperly rejected the testimony of her friend, Tim Brown. More particularly, Noyes contends that the ALJ "failed to meet the requirements of the remand order" because he did not mention Brown's testimony regarding her employment. (Opening Br. 348.) Noyes's argument is utterly misplaced, as the ALJ stated in his decision: "[Brown] testified that as her supervisor on the job, he observed a lot of forgetfulness and absenteeism by claimant and that he would help her complete her work. He also testified that if the claimant were to show up on a regular basis, she could have successfully continued work." (Tr. 348.) Thus, the record shows that, contrary to Brown's assertion, the ALJ did indeed consider Brown's testimony about Noyes's performance as an employee.

Noyes also nitpicks, at times a bit nonsensically, at the ALJ's statement that "[e]ven if Mr. Brown's testimony were given full credibility, it would not preclude claimant from performing work with the limitations contained in her [RFC]." (Tr. 348.) She asserts that the ALJ erred in making this statement since Brown testified that Noyes had an absenteeism problem, which would preclude her from full-time employment. However, given that this statement by the ALJ immediately follows his summary of Brown's testimony pertaining to Noyes's problems with receiving criticism (Tr. 348), not absenteeism, a commonsensical reading suggests that the ALJ was referring to the restriction in the RFC that Noyes have only "occasional contract with the public, coworkers and supervisors without strict time in production

requirements," which indeed would limit Noyes's exposure to criticism on the job (Tr. 340). *See*

*Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) ("[W]e give the opinion a commonsensical

reading rather than nitpicking at it." (citation omitted)).  In short, we find no error with the ALJ's

consideration of Brown's testimony and thus will proceed to Noyes's third argument.

### E.  The ALJ's Evaluation of Dr. Sami's Opinion Is Supported by Substantial Evidence

Noyes next argues that the ALJ erred by failing to properly evaluate the opinion of Dr.

Sami, her treating psychiatrist.  This assertion by Noyes also fails to provide a basis for a

remand.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to

the opinion of a treating physician because of his greater familiarity with the claimant's

conditions and  circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2).  However, this principle is not absolute, as "a treating physician's opinion

regarding the nature and severity of a medical condition is [only] entitled to controlling weight if

it is well supported by medical findings and not inconsistent with other substantial evidence in

the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2);

*Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

In the event the treating physician's opinion is not well supported or is inconsistent with

other substantial evidence, the Commissioner must apply the following factors to determine the

proper weight to give the opinion: (1) the length of the treatment relationship and frequency of

examination; (2) the nature and extent of the treatment relationship; (3) how much supporting

evidence is provided; (4) the consistency between the opinion and the record as a whole; (5)

whether the treating physician is a specialist; and (6) any other factors brought to the attention of

the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). The Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, the ALJ expressly considered Dr. Sami's opinion and wrote an extensive explanation (that is, two lengthy paragraphs occupying two-thirds of a page) as to why he ultimately assigned it "little weight." (*See* Tr. 348-49.) The ALJ noted, among other things, that Dr. Sami's opinion was inconsistent with other medical evidence of record and thus was not entitled to controlling weight. *See Skarbek v. Barnhart,* 390 F.3d 500, 503-04 (7th Cir. 2004) (stating that an ALJ may discount a treating physician's opinion if it is not well-supported by medical findings or is inconsistent with substantial evidence of record, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability). The evidence of record supports the ALJ's conclusion not to assign Dr. Sami's opinion controlling weight, as Dr. Sami's assignment of GAF scores ranging from 48 to 55 (serious to moderate symptoms) conflicts with the GAF score of 65 (mild symptoms) assigned by Dr. Hedrick, who practiced at Park Center with Dr. Sami. Furthermore, Dr. Sami's opinion that Noyes would be absent more than four days of work per month is inconsistent with Dr. Martin's opinion that she is capable of gainful employment, as well as Dr. Shipley's and Dr. Gange's view that she retains the ability to do simple repetitive tasks.

Once the ALJ decided that Dr. Sami's opinion did not merit controlling weight, he assessed the opinion under several of the factors set forth in 20 C.F.R. § 404.1527(d). *See generally Books*, 91 F.3d at 979 (articulating that when conflicting medical evidence exists, the

ALJ must consider the factors articulated in 20 C.F.R. § 404.1527); *see generally Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). The ALJ considered that Dr. Sami was Noyes's treating specialist in psychiatry but that he had a very short treating relationship with her, as Noyes testified that she only saw him once every three months or so for 15 minutes at a time for medications.[14] (Tr. 674-75); *see* 20 C.F.R. §§ 404.1527(d), 416.927(d). Consequently, the ALJ concluded that Dr. Sami's opinion was entitled to "little weight." (Tr. 349.) Therefore, contrary to Noyes's assertion, the ALJ evaluated Dr. Sami's opinion in accordance with 20 C.F.R. § 404.1527.

Furthermore, to the extent that the record contains conflicting evidence concerning the severity of Noyes's mental limitations, it is the ALJ's role to weigh the conflicting medical evidence and resolve the conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We . . . are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."). Here the ALJ did just that, toiling through numerous medical opinions of record to resolve the conflicts. Though Noyes may disagree with the ALJ's ultimate weighing of the evidence, such disagreement does not provide a basis for overturning the ALJ's decision. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("[The Court may not] reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.").

In sum, the ALJ's assessment of Dr. Sami's opinion is supported by substantial evidence and does not warrant a remand of the case.

---

[14] Indeed, Dr. Sami had only four entries of record, one of which was a fill-in-the-blank document. (*See* Tr. 179-83, 210, 229, 602.)

*F. The ALJ's Evaluation of Dr. Rustagi's Opinion Is Supported by Substantial Evidence*

Finally, Noyes asserts that the ALJ improperly evaluated the opinion of Dr. Rustagi, Noyes's most recent treating psychiatrist, who assigned her a GAF of 50 (serious symptoms) and stated that she is "unemployable." Like her other arguments, Noyes's final contention is unpersuasive.

After writing a lengthy summary of Dr. Rustagi's findings (*see* Tr. 346, 347, 349), the ALJ concluded that Dr. Rustagi's opinion was not entitled to controlling weight, explaining that "the determination whether claimant is unemployable is a decision for the Commissioner and [Dr. Rustagi's] statement appears to be based on the statements of claimant rather than the findings of the doctor." (Tr. 349.) Indeed, the determination of disability is a decision reserved to the Commissioner and is not entitled to controlling weight. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-5p.

Furthermore, Dr. Rustagi's opinion that Noyes was "unemployable" (Tr. 637) and "disabled by her psychiatric illness" (Tr. 642) conflicts with the opinions of Dr. Martin, who stated that Noyes was capable of gainful employment, and Dr. Shipley's and Dr. Gange's view that Noyes retains the ability to do simple repetitive tasks. Because of this inconsistency, Dr. Rustagi's opinion was not entitled to controlling weight. *See Skarbek,* 390 F.3d at 503-04.

Moreover, as the ALJ noted in his decision, Dr. Rustagi saw Noyes only a few times. *See* 20 C.F.R. §§ 404.1527(d); 416.927(d). In fact, his March 23, 2006, and July 25, 2006, evaluations were virtually identical, as the July evaluation seemingly parroted the March evaluation word-for-word, much of it repeating Noyes's own report of her symptoms. (Tr. 581-85, 633-37.) "[M]edical opinions upon which an ALJ should rely need to be based on objective

observations and not amount merely to a recitation of a claimant's subjective complaints." *Rice*, 384 F.3d at 371. Consequently, the ALJ's decision to assign little weight to Dr. Rustagi's opinion is amply supported by the record.[15]

## VI. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Noyes.

SO ORDERED.

Enter for this 12th day of August, 2008.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge

---

[15] As final note, the day after Noyes filed her reply brief in this case, the Seventh Circuit Court of Appeals issued its opinion in *Bauer v. Astrue*, No. 07-3325, 2008 WL 2652887 (7th Cir. July 8, 2008), remanding the case to the Social Security Administration. The *Bauer* opinion is worthy of specific mention here, given that Bauer, like Noyes, was diagnosed with bipolar disorder. After due consideration, we concluded that *Bauer* is distinguishable from the facts of record here.

To explain, *Bauer* dealt with the ALJ's assignment of little weight to the opinions of her treating psychiatrist and psychologist who, like Dr. Sami and Dr. Rustagi in the instant case, stated that Bauer could not hold down a full time job. *Id.* Yet, the psychiatrist and psychologist in *Bauer* treated the plaintiff regularly for three years, *id.* at 3, while here Dr. Sami and Dr. Rustagi each treated Noyes for only a handful of sessions over a relatively short period of time. Moreover, in *Bauer* the plaintiff's bipolar disorder could not be controlled despite the fact that she faithfully took her antipsychotic drugs and was hospitalized several times. *Id.* at *1. Here, Noyes offered some questionable reasons for her noncompliance with prescribed treatment and medication, lending significantly less credence to her complaints of a disabling mental impairment. And finally, Bauer's treating physicians apparently were familiar with the "particular requirements" of Bauer's job as a medical technician when they opined that she could not return to full time employment, *id.* at *1, 3, while there is no suggestion here that Dr. Rustagi was familiar with the "particular requirements" of any of Noyes's past work when he conclusorily opined that she was "unemployable."